IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


PATRICIA H. MONTGOMERY,

     Plaintiff,

v.                                    Civil Action No. 3:06cv024

RUXTON HEALTH CARE, IX, LLC,

     Defendant.


**MEMORANDUM OPINION**

     This matter is before the Court on the Defendant's Renewed Motion for Summary Judgment (Docket No. 76).  For the reasons set forth below, the motion is granted.

**BACKGROUND**

     In her Amended Complaint (Docket No. 16), Patricia Montgomery contends that her former employer, Ruxton Health Care, IX, LLC ("Ruxton"), fired her because of her age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq. Montgomery was terminated on December 13, 2004, after working for Ruxton for just over ten months.

     Ruxton, located in Goochland, Virginia, is a skilled nursing facility that provides long term care for the elderly.  On February 1, 2004, Montgomery, a licensed registered nurse, began working for

Ruxton as a minimum data set (MDS) coordinator.[1]  Montgomery's MDS coordinator duties did not include hands-on patient care.  Instead, she was responsible for developing "comprehensive assessments of the nursing needs of each resident" and "coordinating the plan of care that identifies the needs of each resident."  (Martinez Aff. 2.)  The information she collected for each resident was transmitted to the state and generated something called a "CMI score," which impacted the amount of money Ruxton received from the state for patient care. (See Montgomery Dep. 30:1-31:4, Apr. 11, 2006.)  To do her job properly, Montgomery was required to interact with the rest of Ruxton's nursing staff.  (See Martinez Aff. 2.) According to Ruxton, Montgomery's failure to interact constructively with other nurses resulted in her termination.

From the record, it appears that Montgomery had been performing her duties satisfactorily until the "last several weeks of employment," when she started to engage in some of the behavior that Ruxton contends led to her termination.  (Utz Aff. Ex. F. (email from Linda Roush, Ruxton's Director of Nursing, to Wendy Utz, Ruxton's Vice President of Programs and Services, Jan. 2, 2005).)  According to Ruxton's Director of Nursing, Linda Roush, Montgomery stated "several times" that she could not "work like this;" and that her job was "just too much."  (Id.)  Montgomery

---

[1] The person, or persons, who hired Montgomery is a matter of some dispute between the parties, and will be discussed at length below.

also had "several episodes of crying" and "became rude and abrupt with co-workers." (Id.)

On one particular occasion, eleven days before Montgomery was fired, Montgomery accused a co-worker, Susan Meece, of failing to care for a patient properly, even though Montgomery's duties did not include hands-on patient care.[2] (Utz. Aff. Ex. D (complaint form filled out by Susan Meece).) According to Meece, Montgomery used an "angry tone," and "slammed the door" behind Meece after Meece left the room. (Id.) Montgomery denies being rude to Meece, but acknowledges that the incident occurred and that Meece was "upset" about it.[3] (Montgomery Dep. at 24-26, 102:9-11.) The Assistant Director of Nursing, Gloria Jolly, witnessed at least part of the confrontation and asked Meece to file a complaint against Montgomery. (Meece Aff. 1.) Meece did so on the day that the incident occurred. (See Utz. Aff. Ex. D.) Jolly also documented the incident for Montgomery's personnel file. (See Martinez Aff. Ex. B.)

On another occasion, Montgomery accused Jolly of failing to care for a patient properly, and threatened to report her to the

---

[2] Whether the accusation was well-founded is disputed, but that dispute is not relevant to the Court's resolution of this matter.

[3] Montgomery also admits being "very curt" when she "mean[s] business," and admitted being curt with Meece either on this particular occasion or on other occasions (her deposition testimony is unclear on that point). (Montgomery Dep. at 81:20-25.)

3

Director of Nursing, Linda Roush.   (Montgomery Dep. at 47-48.) Montgomery told Jolly that "something [would] be done" if Jolly did not follow Montgomery's instructions respecting the patient's care. (Id. at 48:2.)  Montgomery's duties did not include assigning tasks to Jolly, who was one of Montgomery's superiors.  (See Martinez Aff. at 2.)

By Montgomery's own admission, the incidents with Meece and Jolly were not the only times that Montgomery was critical of her fellow nurses.  (See Montgomery Dep. at 32-33.)  At some point, Roush asked Montgomery to "let her know when things were not going right," and Montgomery complied – first by reporting to Roush, then to Jolly.  (Id. at 32:18-25.)  Over the course of Montgomery's tenure at Ruxton, Jolly alone received more than twenty reports from Montgomery about substandard work performed by other nurses. (Id. at 33:2-11.)  In addition to reporting on nurses who were not, in Montgomery's view, doing their jobs properly, Montgomery also complained about the nurses' unwillingness to attend her weekly care plan meetings. (Id. at 33:16-25.)  Their refusal to attend Montgomery's meetings was "an ongoing issue on a weekly basis." (Id. at 33:21-22.)

4

Montgomery was terminated on December 13, 2004.[4]  The reasons listed for her termination include "[r]ecurrent negative remarks about facility and staff," "minimal teamwork," "complaints without contributing to resolution of problems," "unprofessional conduct," "negative attitude," and a reduction in the facility's CMI score. (See Utz Aff. Ex. C (termination form); Farmer Aff. 2.)  Montgomery immediately was replaced as the MDS coordinator by Connie Elliott. (See Martinez Aff. Ex. D.)  Elliott was a licensed practical nurse, so she had less training, and therefore was paid less money, than Montgomery.  (Montgomery Dep. 110:17-19.)  It is undisputed that Elliott was also significantly younger than the 62-year-old Montgomery.  (See Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. at 2.)  According to Montgomery, however, the position of MDS coordinator had to be filled immediately, and Elliott was the only person at Ruxton who had experience in that position, even though she did not share all of Montgomery's formal qualifications (according to Montgomery, Elliott could not formally hold the title of "MDS coordinator" even though she could perform the job duties of an MDS coordinator).  (Montgomery Dep. 116:25-117:23, 136:25-137:1.)

---

[4]  It is undisputed that Matthew Farmer, Ruxton's Administrator, and Linda Roush, Director of Nursing, fired Montgomery.  The significance of that fact is disputed, and is addressed below.

Montgomery, of course, disputes Ruxton's characterization of her termination, and argues that she was actually fired because of her age.[5]  She contends that the stated reasons for her firing were pretextual and has offered some evidence that she was performing her job satisfactorily at the time she was fired.  First, she notes that no prior disciplinary action was ever taken against her by Ruxton, and that, to the contrary, she actually received compliments from her supervisors.  (Montgomery Aff. 1.)  Second, she has submitted affidavits signed by former co-workers Meece, Margaret Ross, and Susan Strong, which express the affiants' personal views that Montgomery did not display a negative attitude on the job and that she was a competent, or even exemplary, nurse. (Meece Aff. 1; Ross Aff. 1; Strong Aff. 1.)

In addition to offering proof of her good job performance, Montgomery also directly challenges some of Ruxton's evidence of her poor performance.  For example, she claims that Meece's complaint against her was part of a "fictitious paper trail" created to justify her firing.  (Pl.'s Br. in Opp. to Def.'s Renewed Mot. for Summ. J. at 6.)  She also contends that she was

---

[5] In a letter to Eamonn Reilly, President of Ruxton Health Care, Inc., dated December 27, 2004 (fourteen days after Montgomery was fired), Montgomery told Reilly that she believed she was fired because she was highlighting "some real problems concerning patient care" at Ruxton.  Letter from Patricia H. Montgomery to Eamonn Reilly at 1, Dec. 27, 2004.  Montgomery's first reaction, therefore, was not to allege age discrimination.  Of course, that does not preclude her bringing the ADEA claim.

justified in confronting and complaining about other nurses because "a lot of them" "were not doing their job [sic]."[6]  (Montgomery Dep. 42:22-43:1, 85-86.)  Finally, Montgomery completely denies making any emotional threats to quit and, in particular, denies making some of the statements attributed to her in the termination form (i.e., "I think I'll just resign," "I just want to make it through the first of the year").  (Id. at 87:24-88:8.)

Because Montgomery believes that the stated reasons for her firing were pretextual and because she was replaced by someone "approximately half [her] age," Montgomery has concluded that Ruxton fired her in order to replace her with a younger worker. (Id. at 115:3-4.)  In support, she notes that the person who replaced her, Elliott, was hired only a month before Montgomery was fired and seemed not to have any particular job duties in the interim.  (Id. at 50:2-10; Ross Dep. at 28:12-29:3, May 12, 2006; Martinez Aff. Ex. C.)  She also claims that, just "a couple of months" or "a month or so" before being replaced by Elliott, she was asked by Roush, Director of Nursing, whether she was planning to retire.[7]  (Montgomery Dep. at 134:4-12.)

_____

[6] For example, Montgomery claims that she confronted Jolly about her poor patient care only after Jolly had completely neglected to feed or otherwise attend to a bed-ridden patient until 3:00 PM in the afternoon, when Montgomery stopped in to see the patient.  (Montgomery Dep. at 44-48.)

[7] Montgomery also believes that as subject to age discrimination because she is aware of other Ruxton employees who, according to Montgomery, have suffered discrimination based on

In sum, Montgomery disputes Ruxton's stated reasons for terminating her and argues that the record proves age discrimination on the part of Ruxton. She does not move for summary judgment, but contends that the evidence is, at the very least, strong enough to create a question for the jury. Ruxton, on the other hand, has articulated legitimate business reasons for terminating Montgomery, and contends that no evidence of age discrimination exists.

## DISCUSSION

The ADEA makes it "unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1) (2000). The plaintiff in an ADEA case "bears the burden of proving that age was a determining factor in the relevant employment decision." <u>Mereish v. Walker</u>, 359 F.3d 330, 334 (4th Cir. 2004). There are two ways in which a plaintiff can establish an ADEA claim: first, by showing that age bias motivated the employment decision under the so-called "mixed-motive" method; and second, through circumstantial evidence of discrimination under the

---

their ages. However, she cannot provide details sufficient to establish any previous instance (let alone pattern) of age discrimination by Ruxton. (<u>See</u> Montgomery Dep. at 151-55.) Similarly, Ross claims, in her affidavit, to have "experienced adverse treatment by Ruxton based solely upon [her] age," but offers no details or evidence in support of that conclusory legal claim. (Ross Aff. 1.)

"pretext" method established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-05 (1973).  <u>Id.</u>

In her papers, Montgomery relies principally on <u>McDonnell Douglas</u>, but attempts to prove her ADEA claim through both methods described above.  Summary judgment for Ruxton is appropriate, however, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that [Ruxton] is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>see also</u> <u>Celotex Corp. V. Catrett</u>, 477 U.S. 317, 322 (1986).  An issue is not "genuine" under the summary judgment rule unless Montgomery's version of events is supported by sufficient evidence to permit a reasonable jury to find the facts in her favor.  <u>Stone v. Univ. of Md. Med. Sys. Corp.</u>, 855 F.2d 167, 175 (4th Cir. 1988).  Therefore, if Montgomery's evidence is "merely colorable," summary judgment for Ruxton is appropriate.  <u>Sylvia Dev. Corp. v. Calvert County, Md.</u>, 48 F.3d 810, 818 (4th Cir. 1995) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986)).

For purposes of analyzing Ruxton's summary judgment motion, the evidence will be construed in the light most favorable to Montgomery, and all reasonable inferences will be drawn in her favor.  <u>See</u> <u>Anderson</u> at 255.  Of course, a "reasonable" inference cannot be based merely on speculation or conjecture, and whether a

9

factual inference is reasonable "cannot be decided in a vacuum; it must be considered 'in light of the competing inferences' to the contrary." Sylvia Dev. Corp., 48 F.3d at 818 (citations omitted).

## A.    The McDonnell Douglas Method

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court of the United States established a three-part burden-shifting framework which enables a plaintiff to prove that the purported reason for an adverse employment action, such as termination, was actually a pretext for unlawful discrimination. Warch v. Ohio Casualty Ins. Co., 435 F.3d 510, 513 (4th Cir. 2006). First, a plaintiff must establish a prima facie case of unlawful discrimination by a preponderance of the evidence. Id. To make that prima facie case, the plaintiff must show that (1) she is a member of the protected class; (2) she was qualified for her job and met her employer's legitimate expectations; (3) she was discharged despite her qualifications and performance; (4) following her discharge, she was replaced by a substantially younger employee. Id. Once that prima facie case is established, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the termination. Id. at 514. At this stage, the employer's burden "is one of production, not persuasion; it can involve no credibility assessment." Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)). If an employer has produced a legitimate reason for the termination, the

10

plaintiff must prove that the employer's stated reason is pretextual. Id. Proof of pretext, combined with the prima facie case, is sufficient to permit a finding of illegal discrimination. See Reeves, 530 U.S. at 146-47. Here, Montgomery argues that she can prove age discrimination under the McDonnell Douglas framework outlined above, but Ruxton disagrees, arguing that Montgomery cannot make out a prima facie case and cannot prove that the stated reasons for her termination were pretext.

### 1.   Montgomery's Prima Facie Case

First, as described above, Montgomery must make out a prima facie case of age discrimination. Ruxton concedes that Montgomery is a member of the ADEA's protected class and that she was replaced by a substantially younger worker, but argues that Montgomery's on-the-job performance did not meet its legitimate expectations.[8] (See Def.'s Mem. of Law in Supp. of Def.'s Mot. for Summ. J. at 11.) Therefore, to make her prima facie case, Montgomery must overcome evidence of her poor performance to prove by a preponderance of the evidence that she met Ruxton's legitimate expectations. See Warch, 435 F.3d at 515-16 (allowing district courts to consider evidence of poor performance in analyzing

---

[8] At the summary judgment hearing held on February 14, 2007, Ruxton seemed to concede that Montgomery would be able to make a prima facie case under McDonnell Douglas, but, because Ruxton argued otherwise in its papers, and because the hearing largely focused on other disputed aspects of Montgomery's case, the Court will assume that Ruxton made that apparent concession arguendo, and did not intend to abandon this part of its argument.

11

whether an ADEA plaintiff has made a prima facie case under McDonnell Douglas).

The evidence submitted by Ruxton indicates that Montgomery's negative attitude was the primary justification for her termination, and Ruxton contends that her negative attitude fell short of its legitimate expectations.[9]  Ruxton has established its "legitimate expectations" by submitting its employee handbook, which, in a non-exhaustive list, requires employees "to treat all . . . fellow employees with kindness, respect and dignity," and to be "courteous and helpful to . . . fellow employees."  (Montgomery Dep. Ex. 1 at 13-14.)  Ruxton also submitted the affidavit of Diane Martinez, Director of Human Resources at Ruxton, who described Montgomery's job duties.  (See Martinez Aff. 1-2.)  Those duties included "maintaining a good rapport and morale between departments to ensure a team effort is achieved in implementing a comprehensive assessment and plan of care."  (Id. at 2.)  Her duties also required her to have "constant contact" with her fellow nurses.  (Id.)  Montgomery does not contest this description of her job duties, and does not argue that Ruxton's expectations, as defined above, were unreasonable or illegitimate.

_____

[9]  Montgomery's termination form also cites decreased CMI scores as a reason for her termination, but, apart from an affidavit submitted by Farmer mentioning the decreased CMI scores as a reason for Montgomery's termination, Ruxton has provided no evidence to show a decrease in CMI scores or in accompanying state funding.  That said, Montgomery does not dispute that Ruxton's CMI scores decreased during her time as MDS coordinator.

To demonstrate Montgomery's "negative attitude" and general inability to meet Ruxton's legitimate expectations, Ruxton has submitted the complaint form filled out by Meece, Jolly's written description of Montgomery's incident with Meece (which was kept in Montgomery's personnel file), an email written by Roush summarizing Montgomery's negative behavior during her time at Ruxton, and Montgomery's own deposition testimony.[10]  As noted above, Montgomery has admitted making critical comments about her fellow nurses, being "very curt" when she means business, and, in at least two incidents, essentially scolding other nurses for doing their jobs improperly.

In response to Ruxton's evidence, Montgomery argues that she was meeting Ruxton's legitimate expectations because she was never given a verbal or written warning about her job performance and, instead, was actually complimented by Farmer "on several occasions."  (Montgomery Dep. at 135:9-17.)  The absence of formal warnings is significant, according to Montgomery, because such

_____

[10]  Montgomery has not objected to the consideration of the evidence listed above.  To the extent that her deposition testimony and papers can be construed to dispute discrete factual contentions made by Ruxton, Montgomery's version of the facts will be accepted, as is required at summary judgment (except for her own characterization of undisputed occurrences, as is explained *infra*).  For example, Montgomery disputes Ruxton's contention that Roush "had several counseling sessions" with Montgomery to address her negative behavior.  (See Def.'s Mem. of Law in Supp. of Def.'s Mot. for Summ. J. at 12.)  There is no evidence of such "counseling sessions" in the record, and Montgomery's version of that disputed fact will be accepted.

warnings were required before she could be terminated under the policies outlined in Ruxton's Employee Handbook. (See Montgomery Dep. Ex. 1 at 31.) Montgomery has also submitted affidavits from former co-workers, Meece, Strong, and Ross, who say that Montgomery was competent and did not display a negative attitude while at Ruxton. According to Montgomery, the totality of this evidence proves that she was meeting Ruxton's legitimate expectations.

Considering Montgomery's evidence, and the uncontroverted evidence of her critical approach to working with fellow nurses, Montgomery falls short of demonstrating that she met Ruxton's legitimate expectations. While it is certainly true that she did not receive any formal verbal or written reprimands, Ruxton's employee handbook states explicitly that such reprimands are not required prior to termination, and Ruxton has produced other evidence of Montgomery's poor performance, including Meece's complaint form, which, while not a formal reprimand, was written several days before Montgomery was terminated. (See Montgomery Dep. Ex. 1 at 31-32.)

Montgomery argues that Meece's complaint form constitutes a "fictitious paper trail" created to justify her firing, but the record does not support that assertion. (Pl.'s Br. in Opp. to Def.'s Renewed Mot. for Summ. J. at 6.) First, the complaint form was completed on the same day the incident occurred, so it was not part of a post hoc effort to justify Montgomery's termination.

14

(See Utz. Aff. Ex. D.)  Second, Meece testified in her deposition that the complaint was accurate and that she was in no way coerced into filling it out.  (Meece Dep. at 17:16-18:16.)  Thus, the Court finds no reason why Ruxton was not entitled to rely on Meece's complaint form in making its decision to fire Montgomery.

Moreover, Montgomery does not dispute that most of the negative incidents cited by Ruxton occurred (for example, that she was critical of nurses and confronted nurses about their poor performance).  Montgomery characterizes those incidents slightly differently, but her characterization of her own work is insufficient to prove that she was meeting Ruxton's legitimate expectations.  See Hawkins v. Pepsico Inc., 203 F.3d 274, 280 (4th Cir. 2000).  The opinions of her hand-picked co-workers, Meece, Ross, and Strong, are not given much weight in the Fourth Circuit, either.[11]  See id. (finding the opinions of co-workers to be "'close to irrelevant.'"(citations omitted)).

Indeed, it is "the perception of the decision maker which is relevant, not the self-assessment of the plaintiff," so it is important for Montgomery to demonstrate that her supervisors at Ruxton believed that she was meeting expectations.  Id. (citations

---

[11] The Court is especially disinclined to give their views much weight because Montgomery has not established the extent to which those co-workers observed her behavior on the job.  Meece, of course, was present for at least one of the negative incidents cited by Ruxton, but her general evaluation of Montgomery's tenure does not serve to discredit Ruxton's reasonable reliance on her complaint form in deciding to terminate Montgomery.

omitted).  Montgomery can make no such proof.  As explained above, the absence of formal reprimands and the opinions of her co-workers have only limited probative value.  Moreover, her case is not helped by the additional fact that Farmer, Ruxton's central decision maker, complimented her on several occasions.  Montgomery does not say when Farmer's compliments were given, or whether they were intended to be compliments about her entire body of work or, for example, the proper execution of discrete tasks.  Therefore, Farmer's compliments, like Montgomery's other evidence, have only limited probative value in assessing whether Montgomery was meeting Ruxton's legitimate expectations at the time she was fired.

Considering Montgomery's evidence and Ruxton's evidence of Montgomery's inadequate performance (including, for example, her frequent criticism of fellow nurses and her inability to persuade fellow nurses to attend her care plan meetings), a reasonable jury could not find, by a preponderance of the evidence, that Montgomery's performance met Ruxton's legitimate expectations at the time she was fired.  Montgomery therefore fails to make the necessary prima facie case for age discrimination under McDonnell Douglas.

### 2.   Ruxton's Legitimate, Non-Discriminatory Reasons For Termination

Montgomery does not dispute that Ruxton has cited legitimate, non-discriminatory reasons for her termination, as is required under step two of the McDonnell Douglas burden-shifting test.

Montgomery's termination form generally states that she was fired for having a negative attitude, for unprofessional conduct, and for a decrease in CMI scores.

### 3. Montgomery's Proof That Ruxton's Stated Reasons For Termination Are Pretextual

Assuming, arguendo, that Montgomery has made out a prima facie case of age discrimination, Montgomery must prove that Ruxton's stated reasons for firing her were pretextual.  The parties have focused most of their attention on this stage of the McDonnell Douglas analysis.  Ruxton contends that it is entitled to a strong inference, under Proud v. Stone, 945 F.2d 796 (4th Cir. 1991), that Montgomery, who was hired and fired in a short period of time by the same person, was not a victim of age discrimination.  On the other hand, Montgomery contends that she was hired and fired by different people (precluding application of the Proud inference), and that she has provided convincing evidence that the stated reasons for her firing are pretextual.

In Proud v. Stone, the Fourth Circuit held that "in cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer."  945 F.2d at 797.  That strong inference may exist even where the "hirer" and "firer" was not a single individual acting unilaterally on both occasions.  See DeJarnette

17

v. Corning, Inc., 133 F.3d 293, 298 (4th Cir. 1998); Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1183 (10th Cir. 2006). Application of the Proud inference generally makes an ADEA action "amenable to resolution at an early stage," because "[i]t hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job." Id. at 797-98 (citation omitted).

Here, Ruxton argues that Montgomery was hired and fired by Matthew Farmer, Ruxton's Administrator, and that the Proud inference therefore applies. Montgomery concedes that Farmer had a hand in her firing, but claims in an affidavit that she was hired by Flora Strode.[12]  (See Montgomery Aff. 1.)  However, as Ruxton points out, Montgomery's affidavit seems directly to contradict her previous deposition testimony, in which she said she was "hired, actually hired, by Mr. Farmer." (Montgomery Dep. at 66:13.) Because of that apparent contradiction, Ruxton argues, under Rohrbough v. Wyeth Laboratories Inc., 916 F.2d 970, 975 (4th Cir. 1990), that Montgomery's affidavit must be stricken because she may not, as a matter of law, create a genuine issue of material fact simply by retracting damaging deposition testimony with a subsequent affidavit.  The Court need not decide that issue,

---

[12] Montgomery necessarily concedes that Farmer had a central role in firing her because he signed her termination form and, according to Montgomery, "did all the talking" when Montgomery was told of her termination.  (Montgomery Dep. at 106:2-11.)

though, because Montgomery's affidavit is largely consistent with her deposition testimony.  A careful reading of her deposition testimony discloses that Strode did participate in hiring Montgomery, but that Strode acted primarily as a recruiter. (See Montgomery Dep. 55:4-20; 56:8-11; 66:13).  There is also no question, after reviewing Montgomery's deposition testimony, that Farmer joined Strode in actively recruiting Montgomery and gave approval to Strode to hire Montgomery.  (See id.)  Farmer's affidavit confirms that he did not act unilaterally ("I approved the decision of the Director of Nursing to hire Patricia Montgomery"), but also leaves no doubt that he was the ultimate decision maker, and knew that Montgomery was over 40 when he authorized her hire.  (Farmer Aff. 1.)  Therefore, the Court is satisfied that Farmer was a "hirer" for purposes of Proud.

Nevertheless, Montgomery argues that the Proud inference cannot be applied here, or should be minimized, because, even if Farmer did participate in hiring and firing Montgomery, he (1) did not act alone, and (2) made his hiring decision with the help of a person (Strode) who did not also participate in the firing decision (Roush).  Montgomery cites three cases in support of this argument, but none is persuasive.  (See Pl.'s Br. in Opp. to Def.'s Renewed Mot. for Summ. J. at 6 n.6.)  As decisional law makes clear, the Proud inference can apply on facts similar to, or even less compelling than, these.  For example, in DeJarnette v. Corning,

19

Inc., a pregnancy discrimination case, the Fourth Circuit invoked Proud where one of the three people who fired the plaintiff, but did not actually hire the plaintiff, knew that the plaintiff was pregnant at the time she was hired. 133 F.3d at 298. Similarly, in Antonio v. Sygma Network, Inc., a Title VII case, the 10th Circuit applied the Proud inference where the relevant hiring and firing decisions were made by a group, even though the group's membership was not entirely the same at the time of the plaintiff's hiring and firing. 458 F.3d at 1183. Here, as in DeJarnette and Antonio, the relevant decision maker, Farmer, did not act totally alone in making his hiring and firing decisions, but the Court is satisfied that Farmer was a central participant in, and ultimately responsible for, the recruitment, hiring, and firing of Montgomery within a ten month period. Farmer's role was certainly significant enough to merit application of the Proud inference under the relevant decisional law. Because the Proud inference applies in this case, Montgomery can overcome it only with significant evidence of pretext.[13]

On the surface, Montgomery's best argument for pretext is that Ruxton created a "fictitious paper trail" to justify her firing. (Pl.'s Br. in Opp. to Def.'s Renewed Mot. for Summ. J. at 6.)   In

_____

[13] The Proud court posited that "egregious facts" could overcome an application of the Proud inference, but reiterated that "employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing." 945 F.2d at 798.

fact, Montgomery claims that Ruxton "coerced" Meece into signing a "bogus" complaint form.   (Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. at 9.)   However, as discussed above, Montgomery's characterization of Meece's complaint is not supported by the record.

Montgomery also argues that Ruxton's failure to follow its own termination procedures is evidence of pretext.   Ruxton does not dispute that, in terminating Montgomery, it failed to follow the disciplinary steps outlined in its employee handbook, but Ruxton points out, and correctly so, that it explicitly reserves the right to terminate employees at any time without marching methodically through a series of steps.   (See Montgomery Dep. Ex. 1 at 31-32.) In fact, Montgomery was an "at will" employee, and the record contains no evidence that similar at will employees were terminated only after the completion of rote disciplinary steps, or that Montgomery's termination was otherwise exceptional.   (See Montgomery Dep. Ex. 1 at 32.)   Therefore, Montgomery has given the Court no reason to believe that Ruxton's failure to follow voluntary guidelines constitutes evidence of pretext or age discrimination in this particular case.

In addition, pretext is not established by the simple fact that Roush once asked Montgomery about her plans for retirement. Many courts wisely have held that a single inquiry about retirement is not evidence of age discrimination.   See Glanzman v.

Metropolitan Mgmt. Corp., 391 F.3d 506, 513 (3d Cir. 2004); Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714-15 (11th Cir. 1999); Cox v. Dubuque Bank & Trust Co., 163 F.3d 492, 497 (8th Cir. 1998); Greenberg v. Union Camp Corp., 48 F.3d 22, 28 (1st Cir. 1995); McCann v. Litton Systems, Inc., 986 F.2d 946, 949 n.5 (5th Cir. 1993); Colosi v. Elictri-Flex Co., 965 F.2d 500, 502 (7th Cir. 1992). Indeed, a "company has a legitimate interest in learning its employees' plans for the future," particularly when they are of retirement age, and a single inquiry about Montgomery's retirement plans (as opposed to a pattern of harassing inquiries, for example) is hardly evidence of a pretextual firing driven by a discriminatory motive. Colosi, 965 F.2d at 502.

Finally, Montgomery argues that the Proud inference is weakened in this case by the arrival of Connie Elliott only one month before Montgomery was fired. Both Montgomery and Ross state in their deposition testimony that Elliott seemed to have no particular job duties after she was hired, and they indicate that Montgomery might have been fired to make way for the under-worked and younger Elliott. (Montgomery Dep. at 50:2-10; Ross Dep. at 28:12-29:3.) However, this is precisely the type of speculation that the Proud inference exists to combat. Montgomery would ask a jury to believe (indeed, speculate) that Farmer recruited and hired Montgomery, knowing that she was over 60 years old, only to replace her, because of her age, with a less qualified employee a mere ten

months later.  Such an inference is simply unreasonable on these facts.  The choice of Elliott to replace Montgomery is entirely consistent with Ruxton seeking to fill Montgomery's indispensable job with the only available person (1) with any MDS experience, and (2) without other critical duties at that particular time.  The record does not indicate that Ruxton's actions were motivated by age bias, or by any other factor besides those stated on Montgomery's termination form, and the evidence respecting Elliott is certainly insufficient to overcome the inference that should be drawn in these circumstances under Proud.

In sum, Montgomery has adduced no evidence that permits an inference of a pretextual firing by Ruxton, particularly in light of the fact that Farmer hired and fired her within a ten month span.  For that reason, and because Montgomery also cannot make out a prima facie case, Montgomery's ADEA claim cannot survive summary judgment under the McDonnell Douglas method of proof.

**B.  The Mixed-Motive Method**

Montgomery also seeks to prove age discrimination with the so-called "mixed-motive" method, although, as noted above, she has focused her attention primarily on the McDonnell Douglas method of proof.   Under the "mixed-motive" method of proving age discrimination, if Montgomery can provide evidence of discrimination on the part of Ruxton, she "need not demonstrate that [her age] was the sole motivating factor to prevail, so long

as it was a motivating factor." <u>Hill v. Lockheed Martin Logistics</u>
<u>Mgmt., Inc.</u>, 354 F.3d 277, 284 (4th Cir. 2004).  If Montgomery can
make that showing, Ruxton can avoid liability by proving that it
would have terminated her even in the absence of a discriminatory
motive.  <u>EEOC v. Warfield-Rohr Casket Co., Inc.</u>, 364 F.3d 160, 164
(4th Cir. 2004)

Before the Supreme Court's ruling in <u>Desert Palace, Inc. v.</u>
<u>Costa</u>, 539 U.S. 90 (2003), direct evidence of discrimination was
necessary to invoke the mixed-motive method in Title VII and ADEA
actions.  <u>See</u> <u>Warfield-Rohr Casket Co.</u>, 364 F.3d at 163 n.1.
Direct evidence is "evidence of conduct or statements that both
reflect directly the alleged discriminatory attitude and that bear
directly on the contested employment decision." <u>Warch</u>, 435 F.3d at
520 (citations omitted).  In <u>Desert Palace</u>, however, the Supreme
Court held that direct evidence of discrimination is not required
in order to apply the mixed-motive framework in Title VII cases.
539 U.S. 101-02.  Since <u>Desert Palace</u>, some doubt has been cast on
whether direct evidence is still required to invoke the mixed-
motive method in ADEA actions.  <u>See</u> <u>Warfield-Rohr Casket Co.</u>, 364
F.3d at 163 n.1 (noting that the Fourth Circuit has assumed,
without deciding, that <u>Desert Palace</u> does not apply to ADEA
actions); <u>Mereish</u>, 359 F.3d at 339-40 (expressing doubt as to
whether <u>Desert Palace</u> applies to ADEA actions).  The Fourth Circuit
still has not clarified that issue, but it seems, in passing, to

24

have approved the use of the mixed-motive method in ADEA suits that rely only on circumstantial evidence.  See Laber v. Harvey, 438 F.3d 404, 430 (4th Cir. 2006) ("We apply the familiar McDonnell Douglas burden-shifting framework to resolve claims of age discrimination when the plaintiff produces no direct or circumstantial evidence of discrimination sufficient to warrant a 'mixed-motive' analysis.") (citing Desert Palace, 539 U.S. at 101-02).  The Court need not determine the proper resolution of this issue, however, because Montgomery cannot adduce enough direct or circumstantial evidence to allow a reasonable jury to infer age discrimination on the part of Ruxton.

In her papers, Montgomery offers two pieces of supposed "direct evidence" of age discrimination that would justify a mixed-motive analysis under any reading of Desert Palace; however, that evidence is circumstantial, and, even if considered as part of a mixed-motive analysis, would not permit a jury verdict in favor of Montgomery.[14]  (See Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. at 6.)  Montgomery's first piece of evidence is that Linda Roush asked Montgomery if she was going to retire at some indeterminate point a month or two before Montgomery was terminated.  As

---

[14] Even though Montgomery argues that courts may consider circumstantial evidence in mixed-motive cases, she offered only "direct evidence" under that theory of proof.  (See Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. at 6.)  Nevertheless, the Court will consider all the direct and circumstantial evidence that may be construed in her favor in deciding this motion under a mixed-motive analysis.

discussed above, however, this single inquiry about retirement is not evidence of age discrimination.

Montgomery's second piece of evidence comes from her former co-worker, Margaret Ross, who believes, based on her personal observations, that Montgomery was fired because of her age. (Ross Aff. at 1.)  As it turns out, however, Ross's "personal observations" do not include any significant evidence of age discrimination. (Id.)  In her deposition testimony, Ross admits to basing her personal opinion only on what Farmer told her (that Montgomery was terminated because she was too emotional and unable to handle the job) and the fact that Montgomery was replaced by a much younger employee who seemed to have no particular job duties when she was hired. (See Ross Dep. 27:1-10, 28:12-29:3, 30:22-31:2.)  Farmer's alleged statements to Ross are entirely consistent with Ruxton's stated, and legitimate, reasons for firing Montgomery, and Ross's other observations only corroborate Montgomery's deposition testimony about Elliott's limited job duties.[15]  As was discussed above, the evidence respecting Elliott has extremely limited probative value.

---

[15]  Ruxton contends that Ross's affidavit, which asserts knowledge of past age discrimination, is fatally inconsistent with her deposition testimony, which does not support the allegations made in her affidavit.  The Court perceives no fatal inconsistency. Ross's deposition testimony only demonstrates that the conclusions she draws in her affidavit are speculation.

Even considering all the other evidence adduced by Montgomery, she can, at most, make a non-frivolous argument of age discrimination.  It is undisputed that she was replaced by a substantially younger worker who, by all accounts, had limited job duties before replacing Montgomery.  It is also clear that Montgomery was once asked about her plans for retirement.  In addition, Montgomery never received any warnings or reprimands from her superiors prior to her termination.  However, given the significant and largely uncontroverted evidence of Montgomery's critical attitude, a jury would be required to engage in impermissible speculation to conclude that Montgomery's age was even a consideration in Ruxton's decision to terminate her.  Even if, as Montgomery contends, her complaints and criticisms were justified (and they may have been), it is not the role of the Court or the jury to second-guess the wisdom of an employer's decision to terminate an employee.  Instead, the fact-finder's "focus is solely on whether this decision was the result of age bias." Mereish, 359 F.3d at 339.  Here, Montgomery has not adduced evidence sufficient for a jury to determine, by a preponderance of the evidence, that Montgomery's age was even a minor factor in Ruxton's decision to terminate her, so summary judgment for Ruxton is required.

27

**CONCLUSION**

For the foregoing reasons, Ruxton's Renewed Motion for Summary Judgment (Docket No. 76) is granted.

The Clerk of the Court is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.


                                        /s/
                              _____
                                Robert E. Payne
                                United States District Judge

Richmond, Virginia
Date: April 26, 2007